**UNITED STATES,**
Petitioner/Supervisor,

v.

**John G. REYNARD, Supervisee.**

No. 98–CR–2402–IEG.

United States District Court,
S.D. California.

Aug. 26, 2002.

Carol C. Lam, United States Attorney, Mark R. Rehe, Assistant United States Attorney, San Diego, CA, for plaintiff.

Steven F. Hubachek, Benjamin L. Coleman, Federal Defenders of San Diego, San Diego, CA, for defendant.

## ORDER DENYING SUPERVISEE'S MOTION TO DISMISS PETITION FOR REVOCATION OF SUPERVISED RELEASE

GONZALEZ, District Judge.

Presently before the Court is supervisee John G. Reynard's ("Reynard") motion to dismiss the United States Probation Officer's petition for revocation of Reynard's supervised release. For the reasons stated below, the Court denies Reynard's motion.

## BACKGROUND

On October 5, 1998, Reynard pleaded guilty to one count of bank robbery in violation of 18 U.S.C. § 2113(a). [Doc. No. 15.] On December 21, 1998, the Court sentenced Reynard to 30 months in custody, followed by 3 years of supervised release. [Doc. No. 18.] The Court ordered Reynard to comply with several conditions of supervised release, including (1) to "[s]ubmit to a search of person, property, residence, abode or vehicle at a reasonable time and in a reasonable manner by the Probation Officer"; and (2) to refrain from "commit[ting] another federal, state, or local crime." [Doc. No. 19.] On November 3, 2000, after serving time in custody, Reynard's term of supervised released commenced. (June 13, 2002 Petition, p. 1.)

On December 19, 2000, shortly after Reynard commenced his supervised release, Congress enacted the DNA Analysis Backlog Elimination Act of 2000 ("the DNA Act"). The DNA Act requires U.S. Probation Offices to collect a DNA sample from each individual on supervised release "who is, or has been, convicted of a qualifying federal offense." 42 U.S.C. § 14135a(a)(2). Robbery is a qualifying offense. 42 U.S.C. § 14135a(d)(1)(E). The DNA Act expressly indicates that cooperation by qualifying individuals in the collection of the DNA sample is "a condition of that probation, parole, or supervised release." 42 U.S.C. § 14135c. Additionally, simultaneously with passage of the DNA Act, Congress amended the supervised release statute, 18 U.S.C. § 3583, to state: "The court shall order, as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such a sample is autho-

rized pursuant to the DNA [Act]." 18 U.S.C. § 3583.[1]

The DNA Act provides that, once a sample is taken, the Probation Office sends the sample to the FBI for entry into the Combined DNA Index System ("CODIS"), a national DNA database linking DNA evidence in a nationwide computer network. 42 U.S.C. § 14135a(b).[2] In accordance with the provisions of the DNA Act, the U.S. Probation Office for the Southern District of California complies with its duties under the Act as follows. First, qualifying individuals receive notice of the Act's requirements by correspondence and are required to read and sign a disclosure form. Second, an appointment is made for the individual to have a single blood sample drawn by a licensed health care professional. Third, the blood sample is mailed to the FBI in Quantico, Virginia. (Gov't Exhibit 10.)

On May 31, 2002, the U.S. Probation Office sent a letter to Reynard's counsel stating that Reynard was "required to cooperate in the DNA collection process as mandated by" the DNA Act. (Gov't Exhibit 4.) The letter stated that Reynard's probation officer would soon contact Reynard to arrange for the taking of Reynard's blood. The letter further stated that failure to cooperate in the collection of a blood sample: (1) would be a Class A misdemeanor; and (2) would constitute a violation of Reynard's mandatory conditions of supervision. (*Id.*)

On June 4, 2002, Reynard met with his probation officer, David Dilbeck, who in-

formed Reynard that Reynard must comply with the DNA Act. Additionally, Reynard received a one-page "DNA Collection Letter of Instruction," which again informed Reynard that compliance with the DNA Act was mandatory, and non-compliance would constitute a Class A misdemeanor and a violation of a mandatory condition of his supervised release. Reynard signed the DNA Letter of Instruction, indicating that he "underst[ood] the requirements and agree[d] to abide by them." (Gov't Exhibit 5.) Also on June 4, 2002, Reynard received a notice informing Reynard that he must arrive for a blood draw at the Probation Office on June 10, 2002 at 10:00 a.m..

On June 10, 2002, Reynard timely appeared for his blood draw appointment, yet, after a discussion with his defense counsel, declined to submit to having his blood drawn. On June 13, 2002, probation officer Dilbeck petitioned for an order to show cause why Reynard's supervised release should not be revoked. Officer Dilbeck alleged that Reynard violated a mandatory condition by violating a federal law. Specifically, officer Dilbeck alleged that Reynard "declined to cooperate in the collection of his blood in order to obtain a DNA sample, in violation of 42 U.S.C. § 14135a."

On July 11, 2002, Reynard filed the instant motion to dismiss Probation Officer Dilbeck's petition for revocation. Reynard's motion raises eight issues: (1) whether applying the DNA Act to Rey-

---

1. In addition to becoming eligible for revocation of their supervised release, individuals who fail to cooperate in the collection of a DNA sample may be found guilty of a Class A misdemeanor punishable by up to one year in custody and a fine of up to $100,000. 42 U.S.C. § 14135a(a)(5).

2. Prior to passage of the DNA Act in 2000, Congress found that all 50 states required

DNA collection from designated convicted offenders. Congress also found, however, that federal law did not require federal offenders to contribute DNA samples. The legislative history of the DNA Act indicates that Congress passed the Act because of an urgent need to address the gap in coverage of the national DNA index that has left out federal offenders. 146 Cong. Rec. S11645–02, S11647, 2000 WL 1784925 (Dec. 6, 2000).

nard would be impermissibly retroactive under the Supreme Court's *St. Cyr* decision; (2) whether applying the DNA Act to Reynard would be impermissibly retroactive under principles of due process; (3) whether applying the DNA Act to Reynard would violate the prohibition against ex post facto laws; (4) whether applying the DNA Act to Reynard would be an unlawful bill of attainder; (5) whether mandatory collection of a DNA sample from Reynard falls within the "special needs exception" to the Fourth Amendment; (6) whether the DNA Act violates separation of powers principles; (7) whether the DNA Act violates the Commerce Clause; and (8) whether compelled extraction of blood samples under the DNA Act violates the Fifth Amendment privilege against self-incrimination. The Court will address these issues in turn.

## I. Whether applying the DNA Act to Reynard would be impermissibly retroactive under the Supreme Court's *St. Cyr* and *Landgraf* decisions

### A. Legal Principles Governing Retroactivity

■ In 1998, Reynard pleaded guilty to robbery and accepted the terms of his custody and supervised release. Subsequently, in 2000, Congress enacted the DNA Act, thereby altering the conditions of Reynard's supervised release by requiring Reynard to give a DNA specimen. According to Reynard, the DNA Act is inapplicable to Reynard under the two-step test articulated in *Landgraf* and *St. Cyr* because: (1) Congress did not clearly and unambiguously express its intent to apply the DNA Act retroactively; and (2)

the DNA Act impairs vested rights, or creates a new obligation, duty, or disability with respect to past transactions or considerations.

To determine whether it is permissible to apply an act of Congress retroactively, courts apply the two-prong approach set forth in *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) and *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In the first step, the court should "ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively." *St. Cyr*, 533 U.S. at 316, 121 S.Ct. 2271. The statutory language must be "so clear that it could sustain only one interpretation." *Id.* at 317, 121 S.Ct. 2271. A statute fails to achieve this high level of clarity if it is possible to "plausibly" interpret the statute in a manner suggesting that Congress did not intend retroactive application.[3]

If the legislation satisfies this first step, the statute applies retroactively in accordance with clear congressional intent, and the court need not proceed to step two. However, if the statute and the legislative history do not clearly specify whether Congress intended the statute to apply retrospectively, courts proceed to step two and determine whether application of the provision in question would have a retroactive effect. *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. A retroactive effect is one that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If a provision would have such an effect, then the court should pre-

---

**3.** *See Lindh v. Murphy*, 521 U.S. 320, 329 n. 4, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (explaining that existence of "plausible" alternative interpretations of statutory language indicates that statute cannot qualify as "unambiguous" expression of congressional in-

tent to apply statute retroactively). Webster's defines "plausible" as "superficially fair, reasonable, or valuable," or "superficially worthy of belief." WEBSTER'S THIRD INT'L DICTIONARY (1986).

sume that Congress did not intend the statute to apply retroactively.

### 1. Step One: Congressional Intent to Apply the DNA Act Retroactively

■ With regard to the first *St. Cyr* step, Reynard asserts that it is unclear whether Congress intended the DNA Act to apply retroactively. Reynard notes that the DNA Act applies to any individual "who is, *or has been,* convicted of a qualifying federal offense...." 42 U.S.C. § 14135a(a)(1) and (2) (emphasis added). Reynard argues that this "or has been" language does not necessarily support the conclusion that Congress intended the DNA Act to apply retroactively. Reynard asserts, for example, that Congress, by using this "or has been" language, could have intended the Act to cover individuals who committed non-qualifying offenses (e.g., drug offenses) after the enactment of the DNA Act, yet who also committed a qualifying offense at some point prior to the enactment of the DNA Act. Thus, according to Reynard, the DNA Act does not contain retroactivity language "so clear that it could sustain only one interpretation."

In opposition to Reynard's retroactivity argument under the first prong of *St. Cyr,* the government proffers four sources of evidence which purportedly demonstrate Congress's clear and unambiguous intent to apply the DNA Act retroactively. First, the government cites to the language of § 14135a(a)(2) stating that the probation office "shall collect a DNA sam-

ple from each individual who is, *or has been,* convicted of a qualifying Federal offense." 42 U.S.C. § 14135a(a)(2) (emphasis added). The government argues that this language indicates clear congressional intent to apply the DNA Act to *all* individuals currently on supervised release who "have been" convicted of a qualifying crime, regardless of when the qualifying conviction occurred.

Second, the government cites a second provision of the DNA Act, 42 U.S.C. § 14135a(a)(1), which applies to "each individual *in the custody* of the Bureau of Prisons who is, or has been, convicted of a qualifying Federal offense...." 42 U.S.C. § 14135a(a)(1) (emphasis added). The government asserts that this provision of the DNA Act necessarily indicates congressional intent to apply the DNA Act retroactively. According to the government, on the date of the DNA Act's enactment, an individual in federal custody with a qualifying offense on his or her record necessarily committed the qualifying offense prior to the enactment of the DNA Act. Thus, according to the government, § 14135a(a)(1) demonstrates that Congress intended to apply the DNA Act to every individual who has committed a qualifying offense *at any time,* without regard to when the qualifying offense occurred.

Third, the government cites several sources of legislative history suggesting that Congress perceived the absence of federal offenders in the nationwide CODIS databank to be a serious problem in need of an immediate remedy.[4] From this, the

---

4. *See* 146 Cong. Rec. H8572–01, at *H8576 (Appendix Exhibit 7, p. 25) ("One glaring omission in the law that authorized CODIS is that it did not authorize the taking of DNA samples from persons convicted of Federal offenses..."); 146 Cong. Rec. S11645–02, at *S11646 ("Collection of convicted offender DNA is crucial to solving many of the crimes occurring in our communities"); *Id.,* at *S11647 ("[F]or some inexplicable reason, we

do not collect samples from Federal...offenders. We thought we already closed this loophole through 1996 legislation..., but Federal officials claim more express authority is necessary"); H.R. Rep. 106–900(I), at *8 ("[The DNA Act] addresses two areas of concern...[one being] the absence of legal authority for DNA samples to be collected from persons convicted of Federal crimes...").

government concludes that Congress must have intended the DNA Act to apply retroactively to speedily fill the federal "gap" in CODIS by including all qualifying offenders who have committed a qualifying offense at any time in the past.

Fourth, the government cites a Congressional Budget Office ("CBO") cost estimate for implementation of the DNA Act. *See* Appendix, Exhibit 14, p. 58–59 (H.R.Rep. 106–900(I), at *14). In this cost estimate, the CBO estimated that it would cost $500,000 to collect DNA samples from each person in federal custody who "has been" convicted of a qualifying felony. The CBO stated:

> Based on information from the Department of Justice, CBO estimates that there are roughly 6,000 such persons now and that there would be another 2,000 persons incarcerated in fiscal year 2001 and in each year thereafter.

(H.R.Rep.106–900(I), at *14.) In addition, the CBO estimated that it would cost $500,000 to collect DNA samples from each person under federally supervised release who "has been" convicted of a qualifying felony. The CBO stated:

> The Administrative Office of the United States Courts estimates that there are about 1,500 such individuals now and that there would be a few hundred more offenders under federal supervision in fiscal year 2001 and in each year thereafter.

(H.R.Rep.106–900(I), at *14.) According to the government, this CBO cost estimate indicates that Congress intended for the DNA Act to apply retroactively to: (1) all qualifying inmates already in prison at the time of the Act's enactment; and (2) all qualifying persons already on supervised release at the time of the Act's enactment.

The Court has carefully reviewed the parties' arguments, the text of the DNA Act, and the legislative history of the DNA Act. On the basis of this review, the Court concludes that, while Congress may have intended the DNA Act to apply retrospectively, Congress failed to clearly and unambiguously express such intent. In other words, the Court finds that the text and legislative history of the DNA Act are not "so clear that [they] could sustain only one interpretation." *St. Cyr,* 533 U.S. at 316, 121 S.Ct. 2271.

The Court's finding is based on four considerations. First, the plain language of the DNA Act does not clarify the extent to which the Act applies to persons whose qualifying convictions occurred prior to the date on which the Act took effect. While §§ 14135a(a)(1) and (2) expressly apply to a person who "is, or has been" convicted of a qualifying offense, this language does not demonstrate that Congress "affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Landgraf,* 511 U.S. at 272–73, 114 S.Ct. 1483. For example, by inserting the "or has been" language into § 14135a(a)(1), Congress may have intended the Act to cover individuals: (1) who enter federal custody *subsequent* to enactment of the DNA Act; yet (2) who have been convicted of a qualifying offense at any time in the past. Similarly, by inserting the "or has been" language into § 14135a(a)(2), Congress may have intended to cover individuals: (1) who enter federal custody *subsequent* to enactment of the Act; and (2) who have been convicted of a qualifying offense at any time. Thus, because the plain language of the DNA Act is not "so clear that it could sustain only one interpretation," *St. Cyr,* 533 U.S. at 316, 121 S.Ct. 2271, the Court finds that the DNA Act is subject to the presumption against retroactive interpretation.[5]

Second, while the legislative history of the DNA Act suggests that Congress

---

5. As stated above, the alternative interpretation need not be convincing, but only "plausi- ble," *Lindh,* 521 U.S. at 329 n. 4, 117 S.Ct.

passed the Act to fill a gap in the CODIS database resulting from the absence of federal offenders, it does not necessarily follow that Congress intended to fill this gap by applying the Act retroactively. Certainly, many members of Congress believed that the DNA Act served an important purpose by requiring qualifying federal offenders to contribute to the CODIS databank. Moreover, it is possible that Congress desired to fill this "gap" as rapidly as possible by applying the Act retroactively. Nevertheless, the legislative history of the Act contains not a single statement demonstrating that Congress "specifically considered the potential unfairness that retroactive application would produce." [6] *St. Cyr*, 533 U.S. at 317, 121 S.Ct. 2271. In the absence of any direct legislative history pertaining to the retroactivity issue, the Court cannot find that "Congress has directed with the requisite clarity that the law be applied retrospectively." *St. Cyr*, 533 U.S. at 316, 121 S.Ct. 2271.

Third, the Court finds that congressional silence on the retroactivity or non-retroactivity of the DNA Act is significant in

itself. Congress presumably understands the somewhat formulaic textual requirements for expressing congressional intent to make a statute retroactive. *St. Cyr*, 533 U.S. at 318–19, 121 S.Ct. 2271 (stating that Congress may express non-retroactive intent by failing to explicitly expand scope of statute to cover "conviction[s] ... entered before, on, or after" statute's enactment date); *Ye v. INS*, 214 F.3d 1128, 1132 (9th Cir.2000) ("Congress is presumed to be familiar with Supreme Court precedent and to expect that its enactment will be interpreted accordingly"). Moreover, congressional leaders working to secure support for new legislation may not always be capable of resolving potential retroactivity issues. *Landgraf*, 511 U.S. at 261, 114 S.Ct. 1483 ("It is entirely possible—indeed, highly probable—that, because it was unable to resolve the retroactivity issue..., Congress viewed the matter as an open issue to be resolved by the courts"). Thus, the dearth of discussion pertaining to retroactivity in the legislative history may simply indicate that Congress did not decide whether the DNA Act would apply retroactively.[7]

---

2059, or "superficially worthy of belief." WEBSTER'S THIRD INT'L DICTIONARY (1986).

**6.** Senator Patrick Leahy made the only statement that even arguably addresses the retroactivity issue directly. Senator Leahy stated:
While I support H.R. 4640, I believe it falls short in one critical respect: It fails to address the urgent need to increase access to DNA testing for prisoners who were convicted before this truth-seeking technology became widely available. Prosecutors and law enforcement officers across the country use DNA testing to prove guilt, and rightly so. By the same token, however, it should be used to do what is equally scientifically reliable to do—prove innocence.
(146 Cong. Rec. S11645–02, at *S11647.) Senator Leahy's statement is potentially significant because the statement may suggest that, as then drafted, Congress did not intend the Act to apply retroactively to certain pre-enactment convictions. However, Senator

Leahy's statement is ambiguous insofar as it fails to specify whether the Senator was referring to the DNA Act's failure to implicate certain pre-enactment state convictions or, on the other hand, certain pre-enactment federal convictions. The context of Senator Leahy's remark does not help to resolve this ambiguity, as the Senator sandwiched his remark between a discussion of the Act's provision for federal DNA grants to the states, 42 U.S.C. § 14135, and the Act's provision regarding the taking of DNA samples from federal offenders, 42 U.S.C. § 14135a(a). Senator Leahy's reference to "[p]rosecutors and law enforcement officers across the country," however, suggests that the Senator's comment probably referred to pre-enactment state convictions; for example, pre-enactment convictions in capital cases.

**7.** There is another potential explanation for congressional silence regarding the DNA Act's retroactivity. Namely, members of Congress

Fourth, the Court is not persuaded that the CBO cost report clearly and unambiguously indicates that Congress intended the DNA Act to apply retrospectively. Congress did not include the figures set forth in the CBO cost report in the final version of § 14135a(a). Moreover, it appears that the purpose of the cost report was to inform Congress of the CBO's estimate of the potential budgetary ramifications of the passage of legislation. While the cost estimate certainly suggests that CBO believed the DNA Act would apply retroactively, the cost report does not definitively show what Congress intended by passing the amendments. *See, e.g., Lee v. Yee,* 643 F.Supp. 593, 599–600 (D.Hawai'i 1986) (declining to accept congressional intent argument premised on CBO estimate); *Sundberg v. Mansour,* 627 F.Supp. 616, 621 (W.D.Mich.1986) ("The Court does not consider either general references to Congress' intent to decrease public assistance expenditures or the Congressional Budget Office's assumption that § 602(a)(38) would produce net Medicaid costs as sufficient indications of Congress' intent to apply § 602(a)(38) to determinations of Medicaid as well as AFDC eligibility"); *J.A. Jones Constr. Co. v. Southern Stress Wire Corp.,* 575 F.Supp. 365, 368 n. 4 (N.D.Ga.1982) ("To the extent that congressional intent can be inferred from a CBO cost estimate, this court draws a different inference"). Thus, although the Court recognizes that the CBO report provides evidentiary support in favor of construing the DNA Act to be retroactive, the Court is unwilling to rely on the report as a clear indication of congressional intent,

especially given the lack of clear corroborating evidence in the legislative history.

In sum, the Court finds, on the basis of the above four considerations, that the express language of the DNA Act is not "so clear that it could sustain only one interpretation." Although the question is extremely close, the Court finds that the legislative history of the Act does not direct with the requisite clarity that the DNA Act be applied retrospectively. Accordingly, the Court proceeds to the second prong of the *St. Cyr/Landgraf* retroactivity test.

### 2. Step Two: Retroactive Effect of the DNA Act

As discussed above, when a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress expressly prescribed the statute's proper reach. *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. If Congress has done so, the court need not resort to judicial default rules. Yet, if the statute contains no such express command, the court must determine whether the new statute would have a "retroactive effect." *Id.* That is, the court must determine whether the statute would: (1) impair rights a party possessed when he or she acted; (2) increase a party's liability for past conduct; or (3) impose new duties with respect to transactions already completed. If the statute would create such a retroactive effect, the traditional anti-retroactivity presumption should apply. *Id.*

Although the "retroactive effect" analysis appears relatively straightforward, the

may have uniformly assumed that the Act *would* apply retroactively. That is, members of Congress may have assumed that the Act would apply to all persons who "have been convicted" of a qualifying offense at *any time before or after* enactment of the DNA Act. The formulaic "on, before, or after" language referenced in *St. Cyr* is not a prerequisite to

retroactivity, and omission of the "on, before, or after" language is not an infallible sign that Congress intended prospective application only. In passing the DNA Act, retroactivity may simply have been a non-issue among members of Congress, thus resulting in the slightly vague "has been" phraseology of §§ 14135a(a)(1) and (2).

determination of whether a statute has a retroactive effect is not a simple or mechanical task. *Id.*, 511 U.S. at 268, 114 S.Ct. 1483. As the *Landgraf* Court recognized, the Supreme Court has utilized numerous valid formulas for identifying retroactive effect.[8] The "retroactive effect" analysis, however, is not formulaic, but instead relies on judicial conceptions of the nature and extent of the change in the law, and the degree of connection between the operation of the new rule and the relevant past event. *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483. "Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. Retroactivity is a matter on which judges tend to have sound instincts, and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.* (quoting *Danforth v. Groton Water Co.,* 178 Mass. 472, 476, 59 N.E. 1033, 1034 (1901) (Holmes, J.)).

In the instant case, Reynard argues that the DNA Act imposes a new obligation, duty, or disability on him. Reynard contends that

> the DNA Act has an obvious and severe retroactive effect on Mr. Reynard. The DNA Act "creates a new obligation," "imposes a new duty," and "attaches a new disability" on Mr. Reynard by requiring him to submit to the physical intrusion of a blood extraction so that his genetic makeup can become a part of permanent law enforcement files.

(Memo. ISO Motion, p. 5.)

As a factual matter, Reynard's contention is at least partially incorrect because it relies on an overly broad construction of the DNA Act. The DNA Act does not impose on Reynard the duty to contribute his "genetic makeup" to "permanent law enforcement files." In fact, the national DNA identification index, created by Congress in 1994[9], is comprised of particular genetic markers—known as "junk sites"—that are purposely selected because they are not associated with any known genetic trait.[10] "[T]he effect of the system is to

---

**8.** *Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (retroactive effect occurs if law " 'changes the legal consequences' of acts completed before its effective date' ") (quoting *Weaver v. Graham,* 450 U.S. 24, 31, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)); *Union Pacific R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 58 L.Ed. 179 (1913) (retroactive effect occurs if statute gives "a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed"); *Sturges v. Carter,* 114 U.S. 511, 519, 5 S.Ct. 1014, 29 L.Ed. 240 (1885) (retroactive effect occurs if statute "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability"); *Calder v. Bull,* 3 U.S. 386, 391, 3 Dall. 386, 1 L.Ed. 648 (1798). *See also Society for Propagation of the Gospel v. Wheeler,* 22 F.Cas. 756, 767 (C.C.D.N.H. 1814) (Story, J.) (retroactive effect occurs if statute "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or at-

taches a new disability, in respect to transactions or considerations already past").

**9.** 42 U.S.C. § 14132.

**10.** *See* H.R. Rep. 106–900(I), at *26 (genetic markers chosen for national DNA index reveal only DNA configuration at selected "junk sites" that do not reveal any human trait or characteristic). *See also* Martha L. Lawson, *Personal Does Not Always Equal "Private": The Constitutionality of Requiring DNA Samples from Convicted Felons and Arrestees,* 9 WM. & MARY BILL RTS. J. 645, 647–48 (2001); Sonia M. Suter, *The Allure and Peril of Genetics Exceptionalism: Do We Need Special Genetics Legislation?,* 79 WASH U.L.Q. 669, 710 (2001); Adam Kolber, *Standing Upright: The Moral and Legal Standing of Humans and Other Apes,* 54 STAN. L. REV. 169, 170 (2001); Carol Might, *DNA Analysis and the Freedom of Information Act: Information or Invasion?,* 26 OKLA CITY U.L. REV. 773, 774 (2001); Janet L. Dolgin, *Personhood, Discrimination, and the New Genetics,* 66 BROOK L. REV 755, 760 (2001); Akhil Reed Amar, *Foreword: The*

provide a kind of genetic fingerprint, which uniquely identifies an individual, but does not provide a basis for determining or inferring anything else about the person." H.R. Rep. 106–900(I), at *27. Thus, to the extent that Reynard argues that the DNA Act has an impermissible retroactive effect because it reveals Reynard's genetic code to the government, Reynard's argument is factually unsupported.

Furthermore, the DNA Act sets forth express privacy protection standards that prohibit any person from using or disclosing DNA samples for any purpose other than those authorized by the DNA Act. 42 U.S.C. § 14135d. Under these standards, public or private entities that prepare DNA samples for inclusion in the national DNA index must use such samples solely for identification purposes. 42 U.S.C. § 14132(b). Thus, the DNA Act does not, as Reynard contends, impose on Reynard a duty to reveal his "genetic makeup" to federal authorities, or anyone else.

Moreover, while Reynard correctly asserts that the DNA Act imposes on Reynard a duty "to submit to the physical intrusion of a blood extraction" (Memo. ISO Motion, p. 5), the Court finds that the extraction of blood does not, in itself, constitute a "new" duty for retroactivity purposes. On December 21, 1998, the Court sentenced Reynard to 30 months in custody, followed by 3 years of supervised release. [Doc. No. 18.] On that date, the Court imposed upon Reynard the broad duty to "[s]ubmit to a search of person, property, residence, abode or vehicle at a reasonable time and in a reasonable manner by the Probation Officer." Reynard and the government agree that the extraction of blood constitutes such a "search." (Reply Memo. ISO Motion, p. 18.) Thus, although Reynard raises serious questions as to the *reasonableness* of a blood extrac-

tion search,[11] the Court finds that, Fourth Amendment issues aside, blood extraction falls within the scope of Reynard's duty, imposed in 1998, to "submit to a search of [his] person. . . ."

The DNA Act does appear to impose a new disability on Reynard insofar as the Act obligates Reynard to contribute his DNA "fingerprint" to the nationwide DNA identification index. Prior to passage of the DNA Act, Reynard may have been unaware of any potential obligation to contribute his DNA "fingerprint" to CODIS. Moreover, the obligation to contribute a DNA sample to CODIS may effect a disadvantage on Reynard because, should Reynard commit an offense in the future, Reynard's contribution of DNA to CODIS may expose him to an increased risk of arrest, prosecution, and conviction.

The Court, however, finds it unlikely that this new obligation upsets Reynard's reliance interests and settled expectations to a degree sufficient to create a retroactive effect. The Court bases this finding on a close reading of the Supreme Court's *St. Cyr* decision.

Reynard asserts that the Supreme Court's *St. Cyr* decision did not establish a "conscious reliance" test for determining whether a new statute disturbs reliance interests and settled expectations. The Court agrees with Reynard's reading of *St. Cyr*. However, in *St. Cyr*, the Supreme Court unquestionably based its decision on the existence of sufficient evidence showing that "[Mr. St. Cyr], and other aliens like him, almost certainly relied upon th[e] likelihood of [relief from deportation] in deciding whether to forgo their right to a trial. . . ." *St. Cyr*, 533 U.S. at 325, 121 S.Ct. 2271. Thus, while the Supreme Court in *St. Cyr* did not create a strict "actual reliance" test, the *St. Cyr* Court

---

*Document and the Doctrine,* 114 HARV. L. REV. 26, 126 (1999).

**11.** *See infra,* Part V (addressing Reynard's Fourth Amendment arguments).

did indicate that the purported reliance interest at issue cannot be wholly speculative, and must have some basis in fact. *St. Cyr*, 533 U.S. at 321–26, 121 S.Ct. 2271 (reviewing importance of § 212(c) relief in plea agreements prior to AEDPA and IIR-IRA, and concluding that "[St. Cyr], and other aliens like him, almost certainly relied upon th[e] likelihood [of § 212(c) relief] in deciding whether to forgo their right to a trial, [such that] the elimination of any possibility of § 212(c) relief by IIR-IRA has an obvious and severe retroactive effect").

In the instant case, Reynard argues that the DNA Act has a retroactive effect because it upsets the settled expectations of persons who pleaded guilty to qualifying offenses prior to 2000 in reliance on certain considerations regarding "aspects of life after conviction." Reynard asserts that

> the Supreme Court found [in *St. Cyr*] that "as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions...." Similarly, all criminal defendants, as a general matter, consider the aspects of life after conviction, such as supervised release and other requirements, when entering into a plea agreement.

(Reply ISO Motion, p. 8.)

The Court agrees with the inarguable proposition that "criminal defendants, as a general matter, consider the aspects of life after conviction...when entering into a plea agreement." However, this statement is extremely broad and fails to identify or suggest the existence of any particular settled expectation or reliance interest that the DNA Act disturbed. By advancing this proposition, Reynard may be suggesting that he pleaded guilty to robbery in 1998, at least in part, because he knew that his conditions of confinement and supervised release would not require him to contribute a DNA fingerprint to federal authorities.

However, the Court is aware of no evidence suggesting that, prior to 2000, persons who pleaded guilty to federal offenses generally did so with awareness of, and reliance on, their non-obligation to provide a DNA sample. Moreover, the legislative history of the DNA Act suggests that federal defendants in October of 1998 [12] were not "acutely aware" of any non-obligation to provide a DNA sample because, in October of 1998, a federal law already existed by which Congress attempted to create such an obligation.

In 1994, Congress passed the Violent Crime Control and Law Enforcement Act, authorizing the FBI to establish a national index of DNA samples from convicted federal offenders. The FBI exercised this authority by creating CODIS, the national DNA index. In addition, all 50 state legislatures enacted statutes requiring convicted offenders to provide DNA samples for entry into the CODIS system. H.R. Rep. 106–900(I), at *8. Between 1994 and 1996, however, the FBI lacked authority to include DNA data from federal offenders in the CODIS databank. *Id.* In 1996, Congress, as part of AEDPA, expressly provided the FBI with authority to include in CODIS all DNA samples taken from federal offenders.[13] At least some members of Congress believed that the 1996 legisla-

---

**12.** This Court accepted Reynard's guilty plea on October 5, 1998.

**13.** *See* AEDPA § 811(a)(2), Pub. Law 104–132, 110 Stat 1214 (April 24, 1996) (providing that "the Director of the Federal Bureau of Investigation may expand the combined DNA Identification System (CODIS) to include Federal crimes and crimes committed in the District of Columbia"). *See also* 28 U.S.C. § 531.

tion authorized the FBI to begin collecting DNA samples from federal offenders *immediately.*[14]

However, at some point after the passage of AEDPA, the Department of Justice reached the conclusion that the 1996 legislation did not confer the Department with sufficient authority to collect DNA samples from federal offenders. H.R. Rep. 106–900(I), at *9. Despite the Department of Justice's belief, in October of 1998, the month in which Reynard pleaded guilty to robbery, AEDPA § 811(a)(2) continued to authorize the FBI to include DNA samples from all federal offenders in the CODIS index. Not until December of 1998 did the FBI request Congress to enact more explicit statutory authority to allow the FBI to take DNA samples from federal offenders for inclusion into CODIS. *Id.* (citing FBI Laboratory Report to Congress, Implementation Plan for Collection of DNA Samples from Federal Convicted Offenders Pursuant to P.L. 105–[119] (December, 1998)). Thus, in October of 1998, when Reynard pleaded guilty to robbery, federal law appeared to grant the FBI authority to collect a DNA sample from Reynard, although the Department of Justice believed that Congress had not conferred sufficient authority to do so.

For purposes of the instant case, the above legislative history tends to undermine the proposition that, in 1998, federal offenders pleaded guilty with an expectation that they would not have to contribute a DNA fingerprint to CODIS. In 1998, federal law expressly authorized the FBI to expand CODIS by including DNA samples from all such federal offenders. Although some ambiguity persisted regarding the Department of Justice's authority to collect the DNA samples, the writing was clearly on the wall, in the form of an express provision in the United States Code.

Moreover, legislative history aside, Reynard has made no affirmative showing that federal offenders who pleaded guilty to an offense prior to 2000 considered the lack of a federal DNA fingerprinting obligation to be an important consideration in entering their guilty pleas. As such, the Court finds that the 2000 DNA Act, by obligating Reynard to contribute a DNA "fingerprint" to CODIS, does not upset Reynard's reliance interests or settled expectations. Accordingly, the Court finds that the DNA Act does not have a retroactive effect on Reynard and, consequently, applies retroactively to him.

## II. Would application of the DNA Act to Reynard be impermissibly retroactive under principles of due process?

■ Reynard advances a second retroactivity argument. Reynard's second retroactivity argument is not based on the two-step St. Cyr/*Landgraf* test, but instead relies on principles of due process. According to Reynard, even assuming *arguendo* that the DNA Act applies retroactively under St. Cyr and *Landgraf,* the retroactive application of the DNA Act to Reynard does not pass muster under the Due Process Clause.

■ Reynard correctly notes that retroactive legislation is subject to a more strin-

---

**14.** *See* 146 Cong. Rec. S11645–02, at *S11647 ("We thought we already closed this loophole through 1996 legislation which provides that the FBI 'may expand the database to include federal crimes...,' but federal officials claim more express authority is necessary. We are not so sure they're right, but there is no need to wait any longer"); *Id.,* at *S11646 ("[D]ur-

ing consideration of the Anti–Terrorism Act of 1996, [Senator Dewine] proposed a provision under which federal convicted offenders' DNA would be included in CODIS. Unfortunately, the Department of Justice never implemented this law, though currently all 50 states collect DNA from convicted offenders").

gent rationality requirement than is prospective legislation. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16–17, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Like any legislation, retroactive legislation must meet the basic due process requirement of being "supported by a legitimate legislative purpose furthered by a rational means." *Pension Benefit*, 467 U.S. at 729, 104 S.Ct. 2709. Furthermore, with retroactive legislation, there must be an independent rationale for retroactivity. *Id.*, 467 U.S. at 730, 104 S.Ct. 2709. A purpose that supports a law's prospective application is not sufficient, in itself, to justify retroactive application. *Id.* According to Reynard, retroactive application of the DNA Act cannot survive scrutiny under this due process test because Congress has not offered any rationale for applying the Act retroactively.

In response, the government argues that the legislative history of the DNA Act indicates that an independent rationale existed (and exists) for retroactive application of the Act. According to the government, Congress believed that the lack of federal offenders in the nationwide CODIS databank created an "urgent" and "glaring" need to close the "inexplicable" loophole for federal offenders.[15] According to the government, this perceived "urgent" and "glaring" need created a rational basis for applying the DNA Act retroactively because Congress desired to add as many DNA samples as possible, as rapidly as possible, to the CODIS databank. By authorizing the collection of DNA samples from all persons in federal custody or on supervised release, without regard to their dates of conviction, Congress could rationally expect to meet this temporal goal.

After once again examining the legislative history of the DNA Act, the Court agrees that Congress did believe that the prior omission of federal offenders from the national CODIS databank created the need for a rapid remedial action.[16] While this legislative history does not necessarily indicate a clear and unambiguous intent by Congress to make the DNA Act retroactive, the legislative history does appear to provide a rational basis for applying the DNA Act retroactively.[17] In other words,

---

**15.** *See, e.g.*, 146 Cong. Rec. S11645–02, at S11647 ("Every day that DNA evidence goes uncollected and untested, solvable crimes remain unsolved, and people across the country are needlessly victimized. I hope that the House will move quickly to pass H.R. 4640 as amended before it winds up its work for the year.").

**16.** *See, e.g.*, 146 Cong. Rec. H8572–01, at *H8576 (Appendix Exhibit 7, p. 25) ("One glaring omission in the law that authorized CODIS is that it did not authorize the taking of DNA samples from persons convicted of Federal offenses…"); 146 Cong. Rec. S11645–02, at *S11646 ("Collection of convicted offender DNA is crucial to solving many of the crimes occurring in our communities"); *Id.*, at *S11647 ("[F]or some inexplicable reason, we do not collect samples from Federal…offenders. We thought we already closed this loophole through 1996 legisla-

tion…, but Federal officials claim more express authority is necessary."); *Id.* at *H8576 ("This bill does not come a moment too soon, every day that goes by, a real John Doe is out there, committing more rapes, robberies, murders, when he could have been stopped.").

**17.** To the extent that Reynard is arguing that Congress must explicitly articulate its reasons for applying a statute retroactively, the Court, for two reasons, rejects this argument. First, the Court finds no authority indicating that a retroactive statute survives due process scrutiny only if the legislature explicitly articulates its rationale for applying the statute retroactively. Second, if the Court accepts the proposition that Congress must explicitly articulate its retrospective rationale, then the Court must automatically strike the DNA Act, on due process grounds, simply because the Act fails to pass the first *St. Cyr/Landgraf* prong.

the DNA Act's legislative history indicates that retrospective application of the DNA Act is not arbitrary and irrational, but is consistent with Congress's intent in passing the law—i.e., to include DNA samples from federal offenders in the CODIS databank, with all possible speed.

## III. Would application of the DNA Act to Reynard violate the prohibition against ex post facto laws?

### A. Legal Principles Governing Ex Post Facto Laws

The U.S. Constitution provides that "No . . . ex post facto law shall be passed" by Congress. U.S. CONST. Art. 1, § 9, cl. 3. The Ex Post Facto Clause prohibits two types [18] of laws that purportedly are at issue in this case: (1) a law that criminalizes an action done before the passing of the law; and (2) a law that inflicts a greater punishment for a crime than was possible when the crime was committed. *Rogers v. Tennessee*, 532 U.S. 451, 456, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001); *Carmell v. Texas*, 529 U.S. 513, 521–525, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000); *Calder v. Bull*, 3 U.S. 386, 3 Dall. 386, 390, 1 L.Ed. 648 (1798) (Chase, J.).

With regard to whether a law "inflicts a greater punishment for a crime than was possible when the crime was committed"— i.e., the second category of ex post facto law at issue here—the Supreme Court and the Ninth Circuit have provided ample guidance for identifying such laws.

In *Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), the Supreme Court stated that the Ex Post Facto Clause forbids the application of any retrospective law that "disadvantage[s] the offender affected by it." *Miller*, 482 U.S. at 430, 107 S.Ct. 2446. In *United States v. Paskow*, 11 F.3d 873 (9th Cir.1993), the Ninth Circuit adopted this *Miller* "disadvantage the offender" test. The *Paskow* court held: "[T]he ex post facto clause is violated when an amendment to the supervised release statute disadvantages a defendant who committed the underlying offense before the amendment became effective—even if, as here, the defendant committed the act that led to revocation of his supervised release after the amendment was adopted." *Id.* at 883 (emphasis added).[19]

Two years after the Ninth Circuit decided *Paskow*, the Supreme Court disavowed

---

This result would plainly be inconsistent with the *St. Cyr/Landgraf* two-part retroactivity test by rendering superfluous the second *St. Cyr/Landgraf* prong.

18. In all, the Ex Post Fact Clause prohibits four categories of laws. *Rogers*, 532 U.S. at 456, 121 S.Ct. 1693. The parties agree that only two categories are at issue in the instant case.

19. The defendant in *Paskow*, Stuart Paskow, pleaded guilty to robbery and was sentenced in August 1990 to eight months' imprisonment and three years of supervised release. Several months after Paskow committed his offense, Congress amended the supervised release statute, 18 U.S.C. § 3583, to create a mandatory minimum one-year sentence for violation of supervised release for possessing marijuana. Prior to this amendment, the su-

pervised release statute allowed the district court to impose no sentence whatsoever on persons on supervised release found in possession of marijuana. Paskow began his term of supervised release in 1990. In 1992, Paskow tested positive for marijuana use. Consequently, under the amended statute, the district court revoked Paskow's supervised release and imposed the minimum one-year sentence on him pursuant to 18 U.S.C. § 3583. Paskow challenged the revocation on ex post facto grounds. The Ninth Circuit agreed with Paskow's ex post facto argument, holding: "it is unconstitutional to apply a statute that alters, to the defendant's disadvantage, the terms under which eligibility for re-parole is calculated, if that statute was enacted after the date of the underlying offense—even though the act upon which revocation is based occurred after the enactment of the statute." *Id.* at 878.

the *Miller* "disadvantage the offender" test upon which the *Paskow* court relied. In *California Dept. of Corrections v. Morales*, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (April 25, 1995), the Supreme Court stated:

> Our opinion[ ] in *Miller* suggested that enhancements to the measure of criminal punishment fall within the ex post facto prohibition because they operate to the "disadvantage" of covered offenders. But that language...is inconsistent with the framework developed in *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). After *Collins*, the focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of "disadvantage," ... but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.

*Morales*, 514 U.S. 499, 506 n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588.[20]

Three months after the Supreme Court decided *Morales*, the Ninth Circuit, in *Rise v. State of Oregon*, 59 F.3d 1556, 1562 (July 18, 1995), addressed an ex post facto challenge to an Oregon statute requiring all convicted sex offenders, past and present, to provide DNA samples to the state. A group of convicted sex offenders asserted that Oregon's DNA statute increased their "punishment" for past convictions. The *Rise* court stated that "[n]ot every change in a convicted person's situation violates the Ex Post Facto Clause."[21] The *Rise* court further stated that "legislation may lawfully impose new requirements on convicted persons if the statute's 'overall

design and effect' indicates a 'non-punitive intent.'" *Rise*, 59 F.3d at 1562 (citation omitted). The *Rise* court went on to hold that the State of Oregon could require convicted sex offenders to provide DNA samples because the "obvious purpose" of the law was "to create a DNA data bank to assist in the identification, arrest, and prosecution of criminals, not to punish convicted murderers and sexual offenders...." *Id.* at 1562.

Two years after the *Rise* decision, in *Russell v. Gregoire*, 124 F.3d 1079 (9th Cir.1997), the Ninth Circuit set forth a clear test for courts to follow in determining whether a law inflicts a new "punishment" for a prior conviction. In *Russell*, convicted sex offenders challenged the State of Washington's community notification statute, which required registration by offenders, as well as disclosure of offenders' conviction information to the local community. Two such offenders challenged the Washington statute on ex post facto grounds, arguing that the community notification provision imposed a greater "punishment" on them for past convictions.

■ To address this argument, the *Russell* court adopted the "intent-effect" test for determining whether a statute imposes an impermissible post-sentencing "punishment" under the Ex Post Facto Clause. Under the "intent-effect" test, a court determines: (1) whether the legislature intended the statute at issue to be punitive, and (2) whether the sanction is "so punitive" in effect that it prevents the court from legitimately viewing the statute as regulatory or civil in nature, notwithstand-

---

**20.** In *Collins v. Youngblood,* the Supreme Court explained that the Ex Post Facto Clause prohibits the retrospective application of laws that "alter the definition of crimes or increase the punishment for criminal acts." *Collins,* 497 U.S. at 43, 110 S.Ct. 2715.

**21.** *See also Morales,* 514 U.S. at 506 n. 3, 115 S.Ct. 1597 ("[T]he focus of the ex post facto inquiry is not on whether a legislative change produces some sort of 'disadvantage,' ... but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable").

ing the legislature's nonpunitive intent. *Russell*, 124 F.3d at 1087. Thus, the first part of the intent-effect test ("intent") looks solely to the declared purpose of the legislature, as well as the structure and design of the statute. *Id.* The second part of the intent-effect test ("effect") requires the party challenging the statute to demonstrate that the statutory scheme is so punitive in effect that it negates any nonpunitive intent. *Id.* If, after applying the "intent-effect" test, a court determines that a statute does not impose "punishment," then the statute does not violate the Ex Post Facto Clause.[22]

## B. Reynard's Ex Post Facto Arguments

Reynard argues that application of the DNA Act to him violates the Ex Post Facto Clause in two ways. First, Reynard argues that the DNA Act criminalizes an action that was innocent prior to passage of the Act. Specifically, Reynard asserts that "when [Reynard] pled guilty to a qualifying offense, it was innocent for him to fail to test. Now, his failure to test constitutes a criminal offense."[23] (Motion, p. 7.)

Second, Reynard argues that application of the DNA Act to him violates the Ex Post Facto Clause because it increases Reynard's punishment for his 1998 conviction. Specifically, Reynard asserts that "the DNA Act changes punishment, or inflicts greater punishment, than the law allowed when defendant sustained his con-

viction." (Memo. ISO Motion, p. 8.) Reynard argues that the DNA Act imposes greater punishment on him because the Act exposes Reynard to revocation of supervised release if Reynard declines to allow the probation office to draw blood. Reynard asserts that he did not face this potential for revocation prior to passage of the DNA Act. In connection with this second argument, Reynard cites the Ninth Circuit's decision in *United States v. Paskow*, discussed above, and asserts that *Paskow* is "the controlling Ninth Circuit authority on this issue." Reynard argues that, under *Paskow*, Reynard's supervised release cannot be revoked on the basis of a DNA Act violation because the DNA Act was passed after Reynard's underlying conviction.

## C. The Government's Opposition

In response to Reynard's first argument, the government asserts that the DNA Act does not criminalize any act (or omission) that Reynard committed prior to passage of the Act. According to the government, Reynard's refusal to give blood occurred over 18 months after Congress passed the DNA Act. Thus, the government argues the DNA Act criminalizes only new conduct—i.e., Reynard's recent refusal to provide a DNA sample—not Reynard's conduct predating the Act.

In response to Reynard's second argument, the government asserts that the DNA Act does not increase Reynard's

---

**22.** Applying the intent-effect test in *Russell*, the Ninth Circuit held that Washington's community notification statute did not impose an impermissible "punishment" because: (1) the Washington legislature intended to monitor offenders, not punish them; and (2) the Washington statute was not "so punitive" in effect that it must be considered punishment, notwithstanding the legislature's intent. 124 F.3d at 1088.

**23.** Reynard concedes the existence of many cases, such as those involving felon in posses-

sion of firearms statutes, which state that it is permissible to prohibit an individual from engaging in specific conduct based on a prior conviction sustained before the criminal statute's enactment. *See, e.g., United States v. Mitchell*, 209 F.3d 319, 322–23 (4th Cir.2000). Reynard distinguishes these cases by asserting that the DNA Act does not criminalize conduct, but instead criminalizes an *omission* that was innocent prior to passage of the Act—i.e., the failure to contribute blood to the CODIS databank.

"punishment" for his 1998 conviction. In support of this assertion, the government advances two arguments.

First, the government argues that revocation of supervised release is, by definition, not punishment. The government argues that supervised release is merely "a component of the defendant's sentence for the underlying offense." Thus, because supervised release (and its attendant conditions) is simply a part of Reynard's original sentence, the revocation of supervised release is not a "new punishment."

Second, the government argues that, under the "intent-effect" test articulated in *Russell v. Gregoire*, the DNA Act is regulatory, not "punitive," in nature. Applying the first step of the *Russell* "intent-effect" test, the government argues that Congress's central goal in passing the DNA Act was: (1) to augment an informational, nationwide database; (2) to enhance public safety; and (3) to increase the overall accuracy of the criminal justice system by allowing for more accurate adjudication of guilt and innocence.

Applying the second step of the *Russell* "intent-effect" test, the government argues that the overall effect of the DNA Act is not punitive. The government notes that the DNA Act is administrative in nature, and carries only a misdemeanor penalty for non-compliance. *Russell*, 124 F.3d at 1088–89 (misdemeanor crime of failing to register as sex offender constitutes a sepa-

rate punishment for a separate offense, and is not a "punishment" for prior offense). Next, the government cites to at least five cases in which courts have rejected ex post facto challenges to state DNA statutes by holding that such statutes are non-punitive in nature.[24] Finally, the government notes that at least one federal court has sustained the federal DNA Act against an ex post facto challenge. *United States v. Lujan*, Cr. No. 98–480–02 HA, Opinion and Order, pp. 5–8 (D.Or. July 9, 2002) (unpublished) (holding that DNA Act does not increase the punishment for defendant's original offense, and that the Act is not punitive in intent or effect under *Russell* two-part test).

## D. Analysis of Ex Post Facto Arguments

As stated above, Reynard first argues that application of the DNA Act to Reynard criminalizes an act—i.e., failing to provide DNA to the government—that was innocent prior to passage of the Act. This Court is not persuaded by this first argument. The probation office seeks to revoke Reynard's supervised release based on Reynard's June 10, 2002 refusal to comply with the DNA Act. Thus, the DNA Act does not criminalize an act (or omission) that occurred prior to enactment of the DNA Act. Instead, the DNA Act criminalizes Reynard's June 10, 2002 failure to comply with the previously enacted DNA Act.

---

**24.** *Shaffer v. Saffle*, 148 F.3d 1180, 1182 (10th Cir.1998) (Oklahoma DNA statute has "legitimate, non-penal legislative purpose"); *Gilbert v. Peters*, 55 F.3d 237, 238–39 (7th Cir.1995) ("Both federal and state courts have uniformly concluded that statutes which authorize collection of blood specimens to assist in law enforcement are not penal in nature.... The [Illinois] blood specimen statute thus does not run afoul of the Ex Post Facto Clause"); *Jones v. Murray*, 962 F.2d 302, 309 (4th Cir. 1992) (approving Virginia statute, and stating that "a statute that is not penal cannot be ex post facto"); *Kruger v. Erickson*, 875 F.Supp. 583, 589 (D.Minn.1995) (finding that taking blood under Minnesota law did not violate Ex Post Facto Clause because statute "is not penal in nature.... Its purpose is to create a DNA database for law enforcement purposes"); *Vanderlinden v. State of Kansas*, 874 F.Supp. 1210, 1216 (D.Kan.1995) (finding that, because DNA law "is not punitive but furthers a governmental interest in law enforcement, it follows that the statute does not violate ex post facto clause principles").

Reynard's second argument presents a closer question. As stated above, Reynard contends that application of the DNA Act to Reynard increases the "punishment" for his 1998 conviction by exposing him to revocation of supervised release. To resolve this second issue, the Court must apply the *Russell* "intent-effect" test to the facts of this case.[25]

### 1. The DNA Act: Punitive Congressional Intent?

The legislative history of the DNA Act demonstrates that Congress did not create the Act as a means for punishing qualifying offenders for past convictions. Instead, Congress desired to assist law enforcement agencies to perform their basic law enforcement function by "match[ing] DNA samples from crime scenes where there are no suspects with the DNA of convicted offenders." 146 Cong. Rec. H8572–01, at *H8575. Additionally, Congress intended to increase the efficacy of the criminal justice system by "eliminat[ing] the prospect that innocent individuals w[ill] be wrongly held for crimes that they did not commit." *Id.* at *H8576. Furthermore, Congress desired to prevent violent felons from repeating their crimes in the future. 146 Cong. Rec. S11645–02, at *S11646 ("Statistics show that many of these violent felons will repeat their crimes once they are back in society"). This legislative history indicates that Congress did not authorize blood draws under the DNA Act to "punish" qualifying offenders.

### 2. The DNA Act: Punitive Effect?

The Court next must determine whether the blood contribution provisions of the DNA Act are "so punitive" in effect that they override Congress's non-punitive intent. In making this determination, the court is guided by seven factors set forth by the Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *Doe I v. Otte*, 259 F.3d 979, 986–87 (9th Cir.2001). The seven factors are:

(1) whether the DNA Act imposes an affirmative disability on qualifying offenders;

(2) whether collection of blood has historically been regarded as a punishment;

**25.** As a threshold matter, the Court must first address the *Paskow* case, which both sides rely upon for different purposes. Reynard asserts that *Paskow* is "the controlling Ninth Circuit authority" with regard to whether the DNA Act "punishes" Reynard for his 1998 offense. The Court disagrees. As discussed above, the *Paskow* court reached its holding by applying the Supreme Court's "disadvantage" standard, as articulated in *Miller v. Florida*, 482 U.S. at 429, 107 S.Ct. 2446. The Supreme Court, however, expressly abrogated the *Miller* "disadvantage" standard, in *California Dept. of Corrections v. Morales.* 514 U.S. 499, 506 n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588. Thus, *Paskow* is dubious authority, at best, for the proposition that the DNA Act inflicts "punishment" on Reynard for his 1998 offense.

The government's reliance on *Paskow* is similarly unpersuasive. The government correctly cites *Paskow* for the proposition that supervised release is "a component of the defendant's sentence" for the underlying offense. *Paskow*, 11 F.3d at 880. From this, however, it does not follow that the U.S. Probation Office may revoke, or alter the terms of, Reynard's supervised release without ever implicating the Ex Post Facto Clause. In fact, the *Paskow* court held that an improper revocation or alteration of supervised release may, in certain circumstances, give rise to an ex post facto violation. *Paskow*, 11 F.3d at 878. Since *Paskow*, the Ninth Circuit has altered the legal standard for identifying such violations, but does not appear to have disturbed the underlying principle that a revocation may give rise to ex post facto concerns. *See, e.g., United States v. Jackson*, 189 F.3d 820, 822 (9th Cir.1999) (applying "intent-effect" test to determine whether post-conviction alteration of terms of supervised release constituted "punishment").

(3) whether the DNA Act's provisions are effective only upon a finding of scienter;

(4) whether operation of the DNA Act will promote the traditional aims of punishment—i.e., retribution and deterrence;

(5) whether the DNA Act regulates behavior that is already a crime;

(6) whether the DNA Act serves some non-punitive purpose;

(7) whether the DNA blood-draw provisions are excessive in relation to the non-punitive purpose, if any.

*Kennedy,* 372 U.S. at 168, 83 S.Ct. 554; *Doe I,* 259 F.3d at 986–93; *Russell,* 124 F.3d at 1089, 1093.

Application of the *Mendoza–Martinez* factors does not support a finding that the DNA Act is "so punitive" in effect that it prevents the Court from legitimately viewing the DNA Act as regulatory in nature. *Russell,* 124 F.3d at 1087. First, the DNA Act imposes a minimal affirmative disability on qualifying individuals because the Act requires such individuals to contribute a single DNA fingerprint to the nationwide DNA index. *Compare Doe I,* 259 F.3d at 987 (Alaska law required sex offenders to re-register at police stations four times per year, every year, and to provide under oath a wide variety of personal information); *Russell,* 124 F.3d at 1082, 1088 (one-time only registration requirement is not affirmative disability or restraint). Second, the Court finds no authority, and Reynard cites none, to support the proposition that the collection of blood, for identification purposes or otherwise, has historically been regarded as punishment. Third, the penalty provisions of the DNA Act do not require a specific showing of scienter. 42 U.S.C. § 14135a(a)(5).

Fourth, conditions of supervised release have not historically been regarded as punishment, but instead as a means to further the deterrent, protective, and rehabilitative goals of sentencing. *United States v. Eyler,* 67 F.3d 1386, 1393 (9th Cir.1995). Fifth, while the DNA Act does criminalize an individual's failure to submit to a blood draw, such non-compliance is punished as a separate offense, which diminishes potential ex post facto problems. *Russell,* 124 F.3d at 1088–89. Sixth, the DNA Act reasonably serves a non-punitive purpose by "eliminat[ing] the prospect that innocent individuals w[ill] be wrongly held for crimes that they did not commit." 146 Cong. Rec. H8572-01, at *H8576. *See also id.* at *H8578 ("It is crucial for defendants to have access to the CODIS system in circumstances that possibly establish innocence"); 146 Cong. Rec. S11645-02, at *S11646 (finding that DNA testing has exonerated over 75 convicted persons in the United States and Canada).

In sum, the Court finds that the DNA Act does not criminalize any act (or omission) that Reynard committed prior to enactment of the Act. The Court further finds that the DNA Act does not inflict a greater "punishment" on Reynard for Reynard's 1998 robbery conviction. Accordingly, the Court finds that the DNA Act does not, as applied to the facts of this case, violate the Ex Post Facto Clause.

## IV. Is the DNA Act, as applied to Reynard, an unconstitutional bill of attainder?

### A. Applicable Legal Principles

Article I, § 9, cl. 3, of the United States Constitution provides that "[n]o Bill of Attainder...shall be passed" by Congress.[26] For a law to constitute a bill of

---

**26.** Bills of attainder and ex post facto laws are not equivalent, although the concepts overlap substantially. An ex post facto law is necessarily backward-looking because it imposes punishment for past offenses. A bill of attainder, on the other hand, does not neces-

attainder, it must possess three elements. The law must: (1) "single out an identifiable group"; (2) inflict punishment; and (3) dispense with a judicial trial. *Nixon v. Administrator of General Services*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 846–7, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984).

With regard to the "punishment" element, courts apply a three-pronged test for determining whether a challenged act imposes a "punishment" for bill of attainder purposes. First, a court should determine whether the challenged legislative act "falls within the historical meaning of legislative punishment." [27] *Nixon*, 433 U.S. at 475, 97 S.Ct. 2777. Second, courts should determine whether "the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further non-punitive legislative purposes." *Id.* Third, courts should determine whether the legislative record evinces a "Congressional intent to punish." *Id.* at 478, 97 S.Ct. 2777.

## B. Analysis

 Reynard argues that the DNA Act exhibits all three features of a bill of attainder. First, Reynard argues that the

sarily target individuals on the basis of past behavior, but may criminalize prospective behavior by specific people. *Nixon*, 433 U.S. at 469 n. 30, 97 S.Ct. 2777. Although a bill of attainder very often will "punish an individual or group retroactively" (Gov't Memo. in Opp., p. 19), a bill of attainder may also punish prospectively. *See, e.g., Jones v. Slick*, 56 So.2d 459 (Fla.1952).

27. Examples include death, imprisonment, banishment, confiscation of property, and bars to employment. *See, e.g., United States v. Lovett*, 328 U.S. 303, 315–19, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (barring named individuals from employment); *United*

DNA Act singles out individuals based on their past commission of specific qualified offenses. Second, Reynard argues that the DNA Act punishes these individuals by requiring them to provide blood and by authorizing detention of those who refuse. Third, Reynard argues that the DNA Act imposes such punishment without a judicial trial.

The government does not dispute that the DNA Act possesses the first feature of bills of attainder—i.e., "singling out of an identifiable group." The government's opposition focuses on the second two features.

With regard to the "punishment" feature, the government argues that the DNA Act is not punitive because the Act merely imposes new burdens on Reynard. *Nixon*, 433 U.S. at 472, 97 S.Ct. 2777 ("Forbidden legislative punishment is not involved merely because [a statute] imposes burdensome consequences").

Next, the government argues that the DNA Act is not a bill of attainder because it does not "dispense with a judicial trial." The government argues that the instant revocation proceeding is not a mere administrative hearing, but is a full evidentiary hearing before an Article III judge.

*States v. Brown*, 381 U.S. 437, 449–63, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (invalidating legislation that prohibited Communist party member from serving as officer of labor union); *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323–326, 18 L.Ed. 356 (1866) (invalidating state constitutional provision requiring clergymen, as condition of employment, to swear oath that they had supported the Union during Civil War); *Ex parte Garland*, 71 U.S. (4.Wall.) 333, 18 L.Ed. 366 (1867) (invalidating federal statute prohibiting any attorney from practicing in federal court if attorney failed to swear oath that attorney had supported Union during Civil War).

Moreover, the government asserts that "[e]ven if Reynard had been charged under the misdemeanor provisions of the Act..., he would have been afforded the same trial rights as any other misdemeanor defendant." (Memo in Opp., p. 20.)

After considering the parties' arguments, the Court finds, for two reasons, that the DNA Act is not a bill of attainder. First, with regard to the "punishment" element, the extraction of a blood sample from Reynard does not appear to "punish" Reynard when considered in light of the factors elucidated by the Supreme Court in *Nixon*. The obligation of providing a DNA fingerprint to the FBI does appear to place a new burden on Reynard. However, the taking of an offender's DNA fingerprint is closely analogous to the administrative taking of an offender's standard fingerprint or the recordation of an offender's physical characteristics. Moreover, the DNA Act promotes at least two non-punitive goals: (1) establishment of a national DNA database; and (2) greater accuracy in future adjudications of guilt and innocence. Finally, as discussed in connection with Reynard's ex post facto argument, nothing in the legislative history suggests that members of Congress passed the DNA Act as a means of punishing qualifying individuals, including Reynard.

Second, the DNA Act does not deprive Reynard of a judicial trial. Reynard, in support of his argument that a parole revocation hearing is not a judicial trial, cites to a footnote from the Supreme Court's decision in *Selective Service*, 468 U.S. at 847 n. 3, 104 S.Ct. 3348. In *Selective Service*, the Court addressed a bill of attainder challenge to the Selective Service Act, under which persons who failed to register for selective service were ineligible for certain educational benefits. *Selective Service*, 468 U.S. at 844, 104 S.Ct. 3348. In rejecting the plaintiffs' bill of attainder argument, the Court noted, in dicta, that an administrative hearing is not equivalent to a judicial trial. *Selective Service*, 468 U.S. at 847 n. 3, 104 S.Ct. 3348. This elementary statement from *Selective Service* does not support Reynard's argument. Here, the Probation Office has petitioned an Article III court to revoke Reynard's supervised release on the basis of Reynard's violation of the DNA Act. Reynard has received a hearing and an opportunity to present evidence on his behalf, before a neutral fact finder, in an open Article III court. Accordingly, the Court finds that the DNA Act has not deprived Reynard of a judicial trial.[28] For this independent reason, the Court finds that the DNA Act is not an unconstitutional bill of attainder as applied to Reynard.

**28.** *See generally* BLACK'S LAW DICTIONARY (6th Ed.1990) (defining "trial" as a "judicial examination and determination of issues between parties to action, whether they be issues of law or of fact, before a court that has jurisdiction"); *Sims v. ANR Freight System, Inc.*, 77 F.3d 846, 849 (5th Cir.1996) ("A trial is a proceeding designed to be a search for the truth."); *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907) (explaining that theory underlying judicial system is that conclusions are reached on basis of evidence and arguments in open court); *United States v. Weisman*, 736 F.2d 421, 424 (7th Cir.1984) (fundamental principle of American jurisprudence is that decision must be based on evidence received in open court); *Prosser v. Derickson*, 1 S.W.3d 608, 609 (Mo.App.1999) ("trial" occurs where there is full disposition of issues in case, whether disposed of on issues alleged in the pleadings or on the basis of preliminary motions).

### V. Does mandatory collection of a DNA sample from Reynard violate Reynard's Fourth Amendment rights? (Does the collection of DNA fall within the "Special Needs Exception" to the Fourth Amendment?)

#### A. Applicable Legal Principles

The parties agree that the DNA Act requires Reynard to submit to a "search" without probable cause or reasonable suspicion. The parties also agree that the sole Fourth Amendment issue in this case is whether the "special needs exception" to the Fourth Amendment permits the collection of DNA samples from individuals on supervised release pursuant to the DNA Act.

██ Under the "special needs" exception to the Fourth Amendment, a suspicionless search may be allowed where the search is designed to serve "special needs, beyond the normal need for law enforcement." *Ferguson v. Charleston*, 532 U.S. 67, 69, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (special needs exception does not apply where state hospital performs nonconsensual diagnostic tests on pregnant women, in cooperation with police, to obtain evidence of a patient's crime of using drugs while pregnant); *Indianapolis v. Edmond*, 531 U.S. 32, 34, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (special needs exception does not apply to highway checkpoint program with primary purpose of discovering illegal narcotics); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 664–65, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (special needs exception allows random drug testing of student-athletes); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451–55, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (special needs exception applies to sobriety checkpoints aimed at removing drunk drivers from the road); *Skinner v. Railway Labor Executives Assn.*, 489 U.S. 602, 621–33, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (special needs exception applies to drug and alcohol testing program for railway employees involved in train accidents or found to be in violation of particular safety regulations); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 666–67, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (special needs exception applies to U.S. Customs Service's mandatory testing of employees who applied for promotion or transfer to positions involving interdiction of illegal drugs or positions requiring employees to carry firearm).

██ Thus, to determine whether a particular search falls within the special needs exception, a court must first examine whether the purpose of the search goes "beyond the normal need for law enforcement." *Ferguson*, 532 U.S. at 80–86, 121 S.Ct. 1281. If the purpose of the search does go beyond the normal need for law enforcement, then the court must balance: (1) the expectations of privacy held by persons subject to the search; (2) the degree of intrusion into these persons' privacy interests; (3) the public's interest in allowing such searches; and (4) the likelihood that such searches will advance this interest. *Rise v. State of Oregon*, 59 F.3d 1556, 1562 (9th Cir.1995).

██ If the results of a purported "special needs" search may *ultimately* be used for law enforcement purposes, then the search must not involve an undue amount of official discretion. Purported "special needs" searches that may ultimately be used for law enforcement purposes are more likely to pass Fourth Amendment muster if the searches are conducted in a uniform, non-discretionary manner. *Von Raab*, 489 U.S. at 667, 672 n. 2, 109 S.Ct. 1384 (Customs Service's testing of employees who applied for particular positions was reasonable because no official discretion was involved, and all

such employees were tested on blanket basis). *See also Roe v. Marcotte,* 193 F.3d 72, 79–80 (2d Cir.1999); *Rise,* 59 F.3d at 1561–62 (explaining that "evenhandedness" of search contributes to reasonableness of special needs search because evenhandedness prevents such searches from being random or arbitrary acts of government agents).

The Ninth Circuit has applied the special needs exception to uphold a state DNA databank statute against a Fourth Amendment challenge. *Rise,* 59 F.3d at 1562. In *Rise,* the Ninth Circuit upheld an Oregon statute requiring felons convicted of murder or specific sexual offenses to submit blood samples to state authorities for the creation of a DNA databank. The *Rise* court concluded that Oregon's statute was rationally related to the public's interest in preventing recidivism and in accurately identifying and prosecuting murderers and sex offenders. The *Rise* court further concluded that the persons affected by the Oregon statute had reduced expectations of privacy. On the basis of these conclusions, the *Rise* court held that the statute fell within the special needs exception.[29] *Id.*

The Second Circuit also upheld a state DNA collection statute under the "special needs" exception. In *Roe v. Marcotte,* 193 F.3d 72 (2d Cir.1999), the Second Circuit concluded that Connecticut's DNA collection program advanced the government's significant interests in reducing recidivism and assisting law enforcement officials to solve and deter past and future crimes.

*Id.,* 193 F.3d at 79–80. The *Roe* court noted that "[a]lthough the samples may later be used for law enforcement purposes, traditional concerns of probable cause and reasonable suspicion are minimized by the statute's blanket approach to testing." *Id.,* 193 F.3d at 79. The Second Circuit held that the government's significant interests outweighed the minimal intrusion required by contributing blood. *Id.*

Like prisoners, individuals on supervised release have lesser expectations of privacy. This lesser expectation of privacy impacts the "special needs" analysis. *Ferguson,* 532 U.S. at 81 n. 15, 121 S.Ct. 1281 (probationers have lesser expectation of privacy than the public at large); *Griffin v. Wisconsin,* 483 U.S. 868, 873–74, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (probationers endure degree of impingement upon privacy which, while not unlimited, would not be constitutional if applied to public at large). Where the subject of a search has a lesser expectation of privacy, the "special needs" exception is more likely to apply. *Griffin,* 483 U.S. at 873–84, 107 S.Ct. 3164; *Rise,* 59 F.3d at 1559.

**B. The Parties' "Special Needs" Arguments**

Reynard's primary argument is that the purpose of the DNA Act is to effect criminal investigations, and thus searches under the Act fall outside the special needs exception. Reynard argues that, although the "immediate purpose" of the DNA Act

---

**29.** For at least two reasons, the *Rise* decision does not control disposition of the "special needs" issue in the instant case. First, the *Rise* court concluded that the Oregon statute was constitutional "even if its only objective is law enforcement." *Rise,* 59 F.3d at 1559. This statement potentially conflicts with recent Supreme Court decisions suggesting that a statute will not fall within the "special needs" exception if the statute's "primary

purpose" is the investigation of crimes. *Ferguson v. Charleston,* 532 U.S. 67, 80–85, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (special needs exception applies only to searches designed to serve needs "beyond the normal need for law enforcement.") Second, the Ninth Circuit's *Rise* decision addresses Oregon's DNA statute, rather than the federal DNA Act.

may be to create a DNA databank, this purpose is indistinguishable from the purpose of investigating crimes. Reynard states: "It simply cannot be seriously argued that the creation of the database is not primarily for law enforcement use in current and future investigations." (Reply Memo. p. 21.) Additionally, while Reynard recognizes that supervised releasees possess a diminished expectation of privacy, he asserts that his Fourth Amendment protections are not completely abrogated. *Griffin*, 483 U.S. at 873–74, 107 S.Ct. 3164. Moreover, Reynard asserts that the government improperly relies on the Ninth Circuit's *Rise* decision. Reynard asserts that *Rise* is not in accord with the most recent Supreme Court decisions on the "special needs" exception. *See, e.g., Ferguson*, 532 U.S. at 80–85, 121 S.Ct. 1281 (2001) (special needs exception applies only to searches designed to serve needs "beyond the normal need for law enforcement.")

The government contends that searches under the DNA Act fall within the special needs exception. According to the government, the "special needs" exception applies in the law enforcement context, so long as the primary purpose of the statute at issue goes beyond criminal investigation. *Sitz*, 496 U.S. 444, 451–55, 110 S.Ct. 2481, 110 L.Ed.2d 412 (upholding sobriety checkpoints, despite secondary law enforcement purpose, where primary purpose is public safety). Moreover, the government emphasizes that individuals on supervised release have significantly diminished expectations of privacy for purposes of determining whether the special needs exception applies. *Griffin*, 483 U.S. at 876–78, 107 S.Ct. 3164. Finally, the government argues that the primary purpose of the DNA Act is programmatic. That is, Congress intended to create a more complete national DNA database to increase the accuracy of the criminal justice system. The government argues that,

in contrast to this compelling and important interest, the DNA Act imposes only a minimal intrusion into Reynard's privacy...a "mere" needle prick. The government notes that the Ninth Circuit has stated that the gathering of DNA is functionally no more intrusive than the gathering of a fingerprint. *Rise*, 59 F.3d at 1560.

## C. Analysis

■■■ The Court must first determine whether the DNA Act authorizes searches that go beyond the "normal" or "ordinary" need for law enforcement. In determining whether a search goes beyond the normal need for law enforcement, the Supreme Court has distinguished between a law's "immediate purpose" and the law's "ultimate purpose." *Ferguson*, 532 U.S. at 83–85, 121 S.Ct. 1281 ("The threat of law enforcement may ultimately have been intended as a means to an end, but the direct and primary purpose of [the] policy was to ensure the use of those means. In our opinion, this distinction is critical"). *See also id.*, 532 U.S. at 85, 121 S.Ct. 1281 (noting that hospital and police officers developed policy of drug testing pregnant patients *"for the specific purpose of incriminating those patients "*) (italics in original).

In the instant case, the plain text of the DNA Act indicates that Congress's immediate purpose in authorizing DNA "searches" was to permit probation officers to fill the CODIS database with the DNA fingerprints of all qualifying supervisees. 42 U.S.C. § 14135a(a)(2). The DNA Act does not authorize the probation office (or the Bureau of Prisons) to conduct criminal investigations of supervisees using the DNA samples. This comports with the probation office's status as an entity that does not normally engage in the investigation of crimes. *Griffin*, 483 U.S. at 876,

107 S.Ct. 3164 ("Although a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against the ordinary citizen"). Thus, the Court agrees with the government's characterization of the DNA Act as "programmatic" in scope.

Beyond Congress's immediate purpose, the legislative history of the DNA Act suggests that Congress possessed at least three ultimate purposes for authorizing searches under the Act. First, Congress desired to assist state and federal law enforcement agencies with their basic law enforcement functions by "match[ing] DNA samples from crime scenes where there are no suspects with the DNA of convicted offenders." 146 Cong. Rec. H8572–01, at *H8575. Second, Congress desired to increase the accuracy of the criminal justice system by "eliminat[ing] the prospect that innocent individuals w[ill] be wrongly held for crimes that they did not commit." *Id.* at *H8576. *See also id.* at *H8578 ("It is crucial for defendants to have access to the CODIS system in circumstances that possibly establish innocence"); 146 Cong. Rec. S11645-02, at *S11646 (finding that DNA testing has exonerated over 75 convicted persons in the United States and Canada); H.R. Rep. 106–900(I), at *10 ("...DNA matching exonerates any other persons who might

wrongfully be suspected, accused, or convicted of the crime"). Third, Congress desired to prevent violent felons from repeating their crimes in the future. 146 Cong. Rec. S11645-02, at *S11646 ("Statistics show that many of these violent felons will repeat their crimes once they are back in society").

This legislative history indicates that searches conducted pursuant to the DNA Act serve at least two purposes that go beyond the normal need for law enforcement. First, the searches contribute to the creation of a more accurate criminal justice system. This increased accuracy ultimately will exonerate persons who were, or who will be, wrongly convicted of, or charged with, a crime. Second, the searches allow for a more complete DNA database, which will assist law enforcement agencies to solve future crimes that have not yet been committed. Thus, the Court finds that the DNA Act meets the first requirement of the special needs exception by authorizing searches that go beyond the normal need for law enforcement.[30]

Additionally, the Court finds that four other factors indicate that searches of qualifying individuals under the DNA Act fall within the "special needs" exception. First, supervised releasees possess a diminished expectation of privacy, *Griffin*,

---

**30.** The Court recognizes that the DNA Act authorizes the probation office to collect DNA samples that law enforcement authorities may ultimately use in pending, rather than future, criminal investigations. For three reasons, however, the Court finds that this fact does not cause the DNA Act to fall outside the special needs exception. First, as discussed above, Congress's immediate purpose in enacting the DNA Act was to create a more complete DNA identification index, which served several ultimate purposes. Second, while Congress certainly intended the DNA Act, ultimately, to assist law enforcement officials to solve pending criminal investigations, Congress also intended the Act to exonerate wrongly-convicted and wrongly-charged persons. Thus, the DNA Act authorizes searches that go beyond the needs of law enforcement. Third, the DNA Act authorizes only non-discretionary searches, and does not allow probation officers to choose which qualifying individuals to target. *Von Raab*, 489 U.S. at 667, 109 S.Ct. 1384 (Customs Service's testing of employees who applied for particular positions was reasonable because no official discretion was involved, and all such employees were tested on blanket basis); *Rise*, 59 F.3d at 1561 ("evenhandedness" of search contributes to reasonableness of special needs search by preventing random or arbitrary searches).

483 U.S. at 873–74, 107 S.Ct. 3164, and enjoy only "conditional. liberty...dependent on observance of special restrictions." *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Second, the DNA Act authorizes a search—i.e., a single blood draw—that is minimally intrusive. *Rise,* 59 F.3d at 1560. Third, in accordance with the legislative history discussed above, the Court finds that Congress authorized DNA fingerprinting under the DNA Act to promote the public's legitimate interest in a more accurate criminal justice system. Fourth, the Court finds that contribution of DNA to CODIS, pursuant to the DNA Act, is reasonably related to the accomplishment of this legitimate congressional goal.

In accordance with the above, the Court finds that the mandatory collection of DNA from qualifying persons on supervised release, as set forth in the DNA Act, falls within the "special needs" exception of the Fourth Amendment.

## VI. Does the DNA Act violate separation of powers principles by authorizing judicial officers to collect DNA samples from unwilling individuals?

### A. Applicable Legal Principles

 The Constitution limits the exercise of judicial power to "cases and controversies." Executive or administrative duties of a nonjudicial nature may not be imposed on judges. Judicial action that crosses into executive or administrative duties runs afoul of due process. *Morrison v. Olson,* 487 U.S. 654, 677, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *Muskrat v. United States,* 219 U.S. 346, 356, 31 S.Ct. 250, 55 L.Ed. 246 (1911). Probation offices are an investigative and supervisory arm of the courts. *United States v. Me-*

*jia–Sanchez,* 172 F.3d 1172, 1175 (9th Cir. 1999).

In *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), the Supreme Court held that, upon a legitimate congressional delegation of authority, an independent arm of the judicial branch, such as a probation office, may undertake certain functions that a court itself could not itself perform due to separation of powers limitations. *Mistretta,* 488 U.S. at 394 n. 20, 109 S.Ct. 647. In accordance with this principle, Congress has passed 18 U.S.C. § 3606, which permits probation officers to arrest and detain persons on supervised release, provided that probable cause exists. 18 U.S.C. § 3606 ("A probation officer may make such an arrest wherever the probationer or releasee is found, and may make the arrest without a warrant").

### B. The Parties' Separation of Powers Arguments

Reynard notes that the DNA Act authorizes probation officers to "detain, restrain and collect a DNA sample from an individual who refuses to cooperate in the collection of the sample." 42 U.S.C. § 1413a(a)(4). Reynard also notes that, under the Probation Act of 1925, probation officers are court employees directly responsible to district court judges. (Memo. ISO Motion, p. 23.) Additionally, according to Reynard, the federal sentencing guidelines vests probation officers with mere informational, advisory, and supervisory powers.

Reynard argues that, in light of probation officers' limited delegated roles, the DNA Act's "authorization of detention and seizure by judicial officers represents an unprecedented transfer of executive responsibility onto the judicial branch." (Memo. ISO Motion, p. 23.) Furthermore, Reynard argues that the DNA Act dele-

gates "extensive unsupervised police action [to] judicial officers," yet fails to create meaningful standards for carrying out such actions. (*Id.*, pp. 24–25.) Reynard argues that, "[w]hen Congress assigns the judiciary a purely administrative task pursuant to the legislature's police powers, the Constitution compels the judiciary to refuse that delegation of executive functions." (*Id.*, p. 25.)

The government advances three arguments in opposition to Reynard's separation of powers argument. First, the government argues that Reynard is without Article III standing to challenge the power of probation officers to "detain, restrain and collect a DNA sample." According to the government, no probation officer ever detained or restrained Reynard, and thus the Court's ruling on this issue would be merely advisory. Second, the government cites to 18 U.S.C. § 3606, which allows probation officers to arrest individuals on supervised release. The government notes that the constitutionality of section 3606 has never been challenged. Thus, according to the government, "to the extent 18 U.S.C. § 3606 has already provided for arrest powers in probation officers, then that law has also already authorized use of force in reasonable circumstances." Third, the government notes that the Ninth Circuit has recognized the propriety of probation officers' "non-judiciary" tasks relating to monitoring and reporting on a supervisee's conduct. *Mejia–Sanchez*, 172 F.3d at 1175 ("When a probation officer provides a petition on supervised release to a district court, she is fulfilling her statutory obligation to monitor and report on the defendant's conduct").

### C. Analysis

■ Reynard fails to respond to the government's standing argument. Nevertheless, the Court is not persuaded that Reynard's separation of powers argument fails for lack of standing. Reynard was not obligated "to await the consummation of threatened injury to obtain preventive relief." *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 143 n. 29, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Moreover, because there is a credible threat that the DNA Act may be invoked against Reynard in the future, a finding of standing is proper. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Furthermore, the government's failure to disavow application of the DNA Act's "detain" and "restrain" provision favors a finding of standing. *See Farm Workers*, 442 U.S. at 302, 99 S.Ct. 2301 (government's failure to disavow application of challenged provision against parties like plaintiff suggests that plaintiff is not unreasonable in fearing future prosecution under provision).

■ On the merits, however, Reynard's separation of powers argument is not compelling. Congress has delegated broad powers to probation officers, particularly under 18 U.S.C. § 3606, giving probation officers the power to arrest persons on supervised release. These "non-judiciary" powers of probation officers have not been successfully challenged on constitutional grounds. Furthermore, collection of a blood sample from a person on supervised release, in accordance with the DNA Act, appears to fall squarely within the monitoring, supervision, and reporting duties of probation officers. Finally, the "detain" and "restrain" language of the DNA Act does not appear to depart significantly, if at all, from the powers that Congress already has delegated to probation officers under 18 U.S.C. § 3606. Accordingly, the Court finds that the DNA Act does not impermissibly authorize judicial action that crosses into executive or administrative duties and functions.

## VII. Does the DNA Act violate the Commerce Clause?

### A. Legal Principles Pertaining to the Commerce Clause

■ Every law enacted by Congress must be based on a power enumerated in the Constitution. *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 176, 2 L.Ed. 60 (1803). Article I, § 8 of the Constitution gives Congress power "[t]o regulate Commerce . . . among the several States." Congress enacted the DNA Act under its commerce power. H.R. Rep. 106–900(I), at *16. The modern interpretation of Congress's regulatory authority under the Commerce Clause is expansive, but is not without effective bounds. *United States v. Lopez*, 514 U.S. 549, 557, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Courts may invalidate a congressional enactment upon a plain showing that Congress has exceeded its constitutional bounds. *Lopez*, 514 U.S. at 568, 577–578, 115 S.Ct. 1624.

■ Congress may regulate three broad categories of activity under the Commerce Clause. *Lopez*, 514 U.S. at 558–59, 115 S.Ct. 1624.[31] First, Congress may regulate the use of the channels of interstate commerce. Second, Congress may regulate and protect the instrumentalities of interstate commerce, or persons or "things" in interstate commerce. Third, Congress may regulate activities having a "substantial relation" to interstate commerce, or which substantially affect interstate commerce. *Lopez*, 514 U.S. at 558–59, 115 S.Ct. 1624.

In the instant case, the parties' dispute revolves mostly around the applicability of two Supreme Court cases: *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) and *Reno v. Con-don*, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000).

In *Morrison*, a university student brought claims under the Violence Against Women Act (VAWA) against students who allegedly raped her. Congress passed VAWA to prohibit gender-motivated crimes of violence. In *Morrison*, it was undisputed that the VAWA could not fall within either of the first two *Lopez* categories. Thus, the sole issue before the *Morrison* Court was whether the VAWA fell within the third *Lopez* category—i.e., whether the VAWA regulated activity that "substantially affected" interstate commerce. *Morrison*, 529 U.S. at 609, 120 S.Ct. 1740. The Supreme Court in *Morrison* struck down VAWA, holding that Congress may not regulate noneconomic, violent criminal conduct that does not have a "substantial effect" on interstate commerce. *Morrison*, 529 U.S. at 617, 120 S.Ct. 1740. Stated another way, the *Morrison* Court held that the VAWA did not fall within the third *Lopez* category.

In *Reno*, the State of South Carolina brought an action against the United States, challenging the constitutionality of the Driver's Privacy Protection Act (DPPA), a federal law which restricted the ability of states to disclose and sell a driver's personal information. *Reno*, 528 U.S. at 143–47, 120 S.Ct. 666. The government in *Reno* argued that Congress properly enacted the DPPA under the second *Lopez* category of Commerce Clause power. That is, the government argued that DPPA regulated personal, identifying information as a "thin[g] in interstate commerce." The Supreme Court agreed with the government, holding that the personal, identifying information that the DPPA regulated was a "thing" sold or released in

---

**31.** Although these categories pre-date the *Lopez* decision, the Court will refer to the categories as the three *"Lopez* categories."

interstate commerce, and the sale or release of the information in interstate commerce was therefore a proper subject of congressional regulation. *Reno*, 528 U.S. at 149, 120 S.Ct. 666. Stated another way, the *Reno* Court held that the DPPA fell within the second *Lopez* category.

### B. Reynard's Commerce Clause Argument

Reynard, citing the three *Lopez* categories, argues that the DNA Act is unconstitutional because the Act: (1) does not regulate the use of the channels of interstate commerce; (2) does not regulate the instrumentalities of interstate commerce or "things" in interstate commerce; and (3) does not regulate activities having a substantial relation to, or which substantially affect, interstate commerce.

Reynard asserts that *Morrison* is the most analogous decision to the instant case. As stated above, in *Morrison,* the issue was whether violence against women fell within the third *Lopez* activity—i.e., whether violence against women has a "substantial relation or affect" on interstate commerce. The *Morrison* Court held that Congress did not have the power to enact a statute forbidding violence against women because such a law did not even arguably have a "substantial relation" to, or substantially affect, interstate commerce. The *Morrison* Court relied largely on the premise that the problem of violence against women is fundamentally non-economic in nature.

Reynard asserts that *Morrison* controls here. According to Reynard, the DNA Act cannot fall within the third *Lopez* category because the taking of DNA, and the creation of a national DNA databank, is a fundamentally non-economic activity with little or no effect on interstate commerce. Additionally, Reynard asserts that the *Condon* case is distinguishable because, in *Condon,* Congress sought to regulate the

disclosure and *sale* of drivers' personal information. Thus, according to Reynard, the *Condon* Court found a direct economic connection between interstate commerce and the regulation at issue in that case. Reynard contends that no such economic connection exists here.

### C. The Government's Commerce Clause Argument

The government does not attempt to justify the DNA Act under the third category of activity set forth in *Lopez*. Instead, the government attempts to justify the DNA Act under the second *Lopez* category. That is, the government argues that the DNA samples at issue, including those in the national CODIS databank, are "things in interstate commerce."

In support of its argument, the government relies heavily on the *Condon* decision. As stated above, in *Condon,* the issue was whether Congress was empowered, under the second *Lopez* category, to regulate the disclosure and sale of drivers' personal information as a "thing in interstate commerce." The *Condon* Court held that such personal information was in fact a "thing in interstate commerce," and thus was properly regulated by Congress under the second *Lopez* category.

Here, the government asserts that the DNA Act regulates the taking of DNA samples which, after collection, are sent to the FBI for entry into the CODIS databank. 42 U.S.C. § 14135a. Once in the CODIS databank, "federal, state, and local law enforcement agencies from all 50 states can then access it and compare it with DNA analysis taken from crimes they are currently investigating." *See* Memo. in Opp., p. 39 (citing congressional record indicating legislators' intent to bolster the CODIS nationwide DNA databank). Thus, according to the government, the DNA Act directly regulates the collection

and distribution of DNA samples, which are "things in interstate commerce" under the second *Lopez* category.

The government asserts that Reynard improperly focuses only on the third *Lopez* category—i.e., regulation of activities that "substantially affect" interstate commerce. The government states that it is not attempting, at this time, to fit the DNA Act within the third *Lopez* category.

## D. Analysis of Commerce Clause Arguments

 With regard to the Commerce Clause issue, Reynard and the government essentially argue past each other. That is, Reynard cites the *Morrison* decision to support the proposition that Congress did not have power to enact the DNA Act under the third *Lopez* category. On the other hand, the government essentially ignores the third *Lopez* category. The government instead cites the *Condon* decision in support of the proposition that Congress possessed power to enact the DNA Act under the second *Lopez* category, as a "thing in interstate commerce."

After carefully considering the parties' arguments, the Court finds that the DNA Act does regulate a "thing in interstate commerce." The Act regulates the taking of DNA samples, as well as the transportation of such samples to the FBI, where the samples are included in the nationwide CODIS databank for use by law enforcement agencies in all 50 states. 42 U.S.C. § 14135a(b). Stated another way, the DNA Act essentially regulates the collection and distribution of data—i.e., the DNA of certain federal offenders—for distribution and use around the country. In

this sense, the DNA samples, and the resulting DNA data, are literally "things" in interstate commerce.

The government's Commerce Clause argument is vulnerable to attack on grounds that the collection and distribution of DNA is fundamentally non-economic in nature. Thus, the Court must resolve whether, as a matter of law, a "thing in interstate commerce" must be economic in nature to survive Commerce Clause scrutiny.[32] A close reading of the *Condon* Court's holding appears to shed light on this issue. There, the Court held:

> The motor vehicle information which the States have historically sold is used by insurers, manufacturers, direct marketers, and others engaged in interstate commerce to contact drivers with customized solicitations. The information is also used in the stream of interstate commerce by various public and private entities for matters related to interstate motoring. Because drivers' information is, in this context, an article of commerce, its sale or release into the interstate stream of business is sufficient to support congressional regulation.

*Condon,* 528 U.S. at 148, 120 S.Ct. 666.

This language from *Condon* suggests that Congress is empowered to regulate "things" or "articles" in interstate commerce, even where such "things" or articles are merely "released" into the stream of commerce without any sale or other economic transaction. The *Condon* Court approved congressional regulation of "information" that enters "the stream of in-

---

**32.** It is clear that, where Congress passes a law under the third *Lopez* category—i.e., a law with a "substantial relationship to, or which substantially affects, interstate commerce"—the regulation in question must be economic in nature. Here, however, where

the government attempts to justify the DNA Act under the second *Lopez* category, it is less clear whether the regulation must be economic in nature. *See Lopez,* 514 U.S. at 559, 115 S.Ct. 1624.

terstate commerce" to be used by various "public and private entities for matters related to interstate motoring." This language suggests that where Congress regulates a "thing" or "article" in interstate commerce, under the second *Lopez* category, the regulation need not necessarily be economic in nature. There is authority to support this interpretation of the second *Lopez* category.[33]

In conclusion, the Court finds that Congress, under the second *Lopez* category, possessed the authority to enact the DNA Act under the Commerce Clause because the DNA Act regulates "things in interstate commerce." While the DNA Act is not economic in nature, relevant authorities discussing the second *Lopez* category suggest that the requirement of an economic impact is relaxed when the regulation at issue pertains to "things in interstate commerce."[34]

33. *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 549–50, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) (holding that transactions may constitute commerce although they do not "concern the flow of anything more tangible than electrons and information"); *United States v. Simpson*, 252 U.S. 465, 467, 40 S.Ct. 364, 64 L.Ed. 665 (1920) (holding that it is interstate commerce to carry across a state line in a private automobile five quarts of whiskey intended for personal consumption); *Hoke v. United States*, 227 U.S. 308, 320–23, 33 S.Ct. 281, 57 L.Ed. 523 (1913) (holding that it is interstate commerce to transport a woman from one state to another in a common carrier); *Pensacola Tel. Co. v. Western Union Tel. Co.*, 96 U.S. 1, 11, 6 Otto 1, 24 L.Ed. 708 (1877) (defining interstate commerce to include the transmission of intelligence over interstate telegraph lines). *United States v. Faasse*, 265 F.3d 475, 484 n. 7 (6th Cir.2001) (defining "things in interstate commerce" to require economic component would render unconstitutional innumerable federal statutes criminalizing the possession of drugs or weapons which have traveled interstate, and innumerable federal regulations of the highways and the nation's airspace);

## VIII. Does compelled extraction of blood samples under the DNA Act violate the Fifth Amendment privilege against self-incrimination?

Reynard's eighth and final argument does not require serious scrutiny. The Supreme Court, in *Schmerber v. California*, 384 U.S. 757, 764–65, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), held that blood test evidence, although potentially incriminating, is neither testimony nor evidence relating to any communicative act. Accordingly, the Court held that involuntary seizure of a blood sample does not implicate the Fifth Amendment privilege. *See also Belgarde v. Montana*, 123 F.3d 1210, 1214 (9th Cir.1997) (blood test results from non-consensual blood test, which ultimately lead to defendant's conviction, are not testimonial or communicative evidence implicating Fifth Amendment concerns).

*United States v. Bailey*, 115 F.3d 1222, 1228 n. 7 (5th Cir.1997) (rejecting attempt to define commerce as "bilateral commercial transaction[ ]" and noting that such definition would require overruling numerous Supreme Court precedents); *NLRB v. Nat'l Survey Serv., Inc.*, 361 F.2d 199, 203 (7th Cir.1966) (transactions may be commerce though non-commercial in nature). *See also Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 189–190, 6 L.Ed. 23 (1824) ("Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse").

34. As a final matter, the Court notes that "[d]ue to respect for the decisions of a coordinate branch of government, courts should invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *Lopez*, 514 U.S. at 568, 577–578, 115 S.Ct. 1624. Here, based on the above considerations, the Court finds that Reynard has not made such a "plain showing."

## CONCLUSION

For the reasons stated above, the Court **DENIES** supervisee Reynard's motion to dismiss the probation office's petition for revocation of supervised release.

**IT IS SO ORDERED.**